ABELE, J.
{¶ 1} Adam Hudson, defendant below and appellant herein, appeals his Pickaway County Common Pleas Court judgment of conviction and sentence for murder in violation of R.C. 2903.02(A).
{¶ 2} Appellant assigns one error for review:
"THE DENIAL OF APPELLANT'S MOTION TO SUPPRESS STATEMENTS MADE DURING THE COURSE OF A CUSTODIAL POLICE INTERROGATION REST UPON FINDINGS OF FACT FAILED [SIC] TO MEET THE APPLICABLE LEGAL STANDARDS ATTENDANT TO A SUPPRESSION INQUIRY."
{¶ 3} On December 2, 2016, a Pickaway County Grand Jury returned an indictment that charged appellant with (1) one count of murder, in violation of R.C. 2903.02(A), an unspecified felony, for causing the death of Thomas Mead, and (2) one count of burglary, in violation of R.C. 2911.12(A)(1), a second-degree felony. Appellant entered not guilty pleas.
{¶ 4} On January 25, 2017, appellant filed a motion to suppress statements that he made to the police. At the hearing on the motion, Circleville Police Department Detective Phillip Roar and the appellant testified at the hearing. The trial court also viewed a transcript and a video of the interrogation.
{¶ 5} After considering the evidence, the trial court denied appellant's motion to suppress. The court noted that although the evidence shows that appellant requested an attorney at 22 minutes into the interview, and again at 68 minutes into the interview, at 75 minutes into the interview appellant asked detectives *3 whether he could "take back" his request for an attorney. The court pointed out that during the portion of the interview when appellant invoked his right to counsel, the investigators did not ask questions about the criminal investigation, but rather general questions that pertained to the defendant's arrest and custody as a parole violator. The court stated "[b]ecause the investigators had already determined that Mr. Hudson was on parole, the officers spent the intervening time identifying and contacting his parole officer (who found Mr. Hudson to be in violation of the terms of his parole), gathering the defendant's general contact information, and preparing Mr. Hudson to be transported to the jail because of his parole violation. Only incidental questions were asked, such as how to power off defendant's phone, whether he needs to use the restroom or was thirsty, and whether he had an attorney of his own that he liked. After viewing the video, and reading the transcript, this Court finds that the actions of the investigators during the period of time when Mr. Hudson was standing on his rights only pertained to the arrest and custody of the defendant and were in no way an interrogation of the crime being investigated."
{¶ 6} The trial court further noted that, after appellant stated that he wanted to "take back" his request for counsel, officers twice reminded him that he had been smoking marijuana and may be impaired. Appellant responded that the amount of marijuana he had smoked was "nothing for my tolerance." The interviewer further advised appellant "let's let that get out of your system a little bit and let you think a little bit. Get a little bit more clear headed." Appellant responded, "I am clear headed." The interviewer then stated "I still may have to let you reflect on it, at least for the next 24 hours." The trial court stated "The record continues in this vein until the investigators finally relent to Mr. Hudson's insistence on returning to the interrogation. The transcript and video show that the investigators spent 20 minutes resisting Mr. Hudson's attempts to withdraw his request for an attorney before finally providing him with a Constitutional Rights Waiver to review and sign. Even then, the detective explained Mr. Hudson's rights to him extensively, carefully rephrasing the wording of the form an even asking Mr. Hudson to repeat back his understanding of his rights. The facts show that Mr. Hudson did initiate further discussions with the police, and did knowingly and intelligently waive the right he had previously invoked."
{¶ 7} The trial court also indicated that the video showed that appellant appeared to be lucid. "There was no indication of slurring or confusion. In addition, Mr. Hudson repeatedly claimed that he was not impaired." The court also addressed appellant's complaint that he was hungry and that detectives "enticed him to speak to them and participate in the interrogation by providing him with fast food." The court noted that appellant did not mention his hunger until 78 minutes into the interview. "Notably, his request for food came after he had asked to withdraw his request for an attorney. Fifty-four minutes later, the officers provided him with fast food, which they had purchased and picked up from Wendy's. After Mr. Hudson was presented with the food, he took several minutes, unwrapping and arranging his food and talking to detectives, before he commenced eating. This is hardly the behavior of a starving person." Accordingly, the trial court found no support for appellant's contention that the detectives providing food enticed appellant to speak and to participate in the interrogation. Thus, the court denied the motion to suppress.
*4 {¶ 8} On April 12, 2017, appellant filed a pro se request for a pre-trial hearing and to dismiss his appointed counsel. On April 14, 2017, the trial court excused counsel and appointed different counsel. On May 26, 2017, appellant filed a motion for leave to file a written plea of not guilty by reason of insanity (NGRI) and a request for a psychological evaluation. The court granted the appellant's requests, and subsequently, held a hearing on appellant's competency. The court found appellant competent to stand trial.
{¶ 9} On August 15, 2017, appellant entered a plea of no contest to murder in violation of R.C. 2903.02. The trial court sentenced appellant to serve "fifteen years to life, with said sentence to be served consecutive to the time remaining on postrelease control that had been ordered by the Hocking County Court of Common Pleas in case 2009CR04, that being 296 days as of the day of this sentencing." This appeal followed.
{¶ 10} In his sole assignment of error, appellant asserts that the "denial of appellant's motion to suppress statements made during the course of a custodial police interrogation rest upon findings of fact [that] failed to meet the applicable legal standards attendant to a suppression inquiry."
{¶ 11} An appellate court's review of a decision on a motion to suppress evidence "presents mixed questions of law and fact." State v. Burnside , 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71 at ¶ 8. In a motion to suppress, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and evaluate witness credibility. State v. Mills , 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992), citing State v. Fanning , 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). Thus, in our review, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. State v. Guysinger , 86 Ohio App.3d 592, 594, 621 N.E.2d 726 (4th Dist.1993). Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusions, whether they meet the applicable legal standard. State v. Michael , 4th Dist. Adams No. 09CA887, 2010-Ohio-5296, 2010 WL 4273225, ¶ 6, citing State v. Klein , 73 Ohio App.3d 486, 488, 597 N.E.2d 1141 (4th Dist.1991).
{¶ 12} Appellant contends that his statements to police during his custodial interrogation (1) were obtained without following the required procedural safeguards of Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and (2) violated appellant's privilege against self-incrimination.
{¶ 13} The Fifth Amendment to the United States Constitution provides that "No person shall * * * be compelled in any criminal case to be a witness against himself." Article I, Section 10 of the Ohio Constitution guarantees the same. In Miranda v. Arizona , the United States Supreme Court delineated the warnings that must be given to a suspect before custodial interrogation. A suspect subjected to questioning in police custody must first be warned that (1) he or she has the right to remain silent, (2) anything he or she says can be used against him or her in a court of law, (3) he or she has the right to the presence of an attorney, and (4) if he or she cannot afford an attorney, if desired, one will be appointed for him or her prior to any questioning. Miranda at 479, 86 S.Ct. 1602. An individual may waive his or her right to remain silent and to have a lawyer as long as the waiver is knowingly and intelligently made. Id.
{¶ 14} The first issue in Miranda confession cases is usually whether a custodial *5 interrogation actually occurred for purposes of Miranda . The state argues here that appellant was not under arrest at the time he made his pre and post- Miranda statements and that he came voluntarily to the police station.
{¶ 15} In general, "a defendant need not be under arrest to be "in custody" for Miranda purposes. State v. Farris , 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, ¶ 13. The requirement that police officers administer Miranda warnings applies when a suspect is subjected to both custody and interrogation. State v. Dunn, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, ¶ 24. In other words, " Miranda rights only attach when both custody and interrogation coincide." State v. Tellington, 9th Dist. Summit No. 22187, 2005-Ohio-470, 2005 WL 293518, citing State v. Wiles , 59 Ohio St.3d 71, 83, 571 N.E.2d 97 (1991) ; State v. Gurley , 2015-Ohio-5361, 54 N.E.3d 768, ¶ 32. "[A]n individual has been placed into custody [if] * * *, under the totality of the circumstances, a 'reasonable person would have believed that he was not free to leave.' " State v. Gumm , 73 Ohio St.3d 413, 429, 653 N.E.2d 253 (1995). And, "the 'term interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " State v. Williams , 4th Dist. Scioto No. 10CA3381, 2012-Ohio-6083, 2012 WL 6681893, ¶ 18, quoting Rhode Island v. Innis , 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).
{¶ 16} Turning to the facts of this case, our review of the record reveals that appellant voluntarily rode with officers in their cruiser to the police station. Once there, the first video clip shows that appellant sat in the interview room for 14 minutes with the door closed. When officers entered the room and began to talk with appellant, they informed him that he was not under arrest. Officers discussed where appellant worked, why he was on parole, and when he had last seen Thomas Mead. Officers took appellant's cell phone, telling him "We're just here to talk." Appellant stated: "You, you, you're asking me about my day. Last time I seen him. Okay, he passed away is what you guys just said when you came up to me. I already know where you're gonna try to get at. I don't want to speak no more until I get a lawyer. * * * I don't have to say nothing else. I don't want to say anything that would incriminate me. And I'm high, I, I... I'm smoking this (marijuana). I don't want to be tricked into talking about things that I shouldn't. Or that doesn't even really matter. Or trying to catch in lies or anything. There's nothing to be told but I don't... I'm not saying no more til I talk to a lawyer." At that point, officers left appellant for twenty-two minutes with the door shut to again check with appellant's parole officer. After the officers returned and asked for his phone code, they again left for another twelve minutes with the door shut to again check with appellant's parole officer.
{¶ 17} During the second video clip, appellant sits for eight minutes in the room with the door shut before officers returned and announced that they intended to take his clothes and take photographs of his body as part of the investigative process. At that point, appellant said "where's my attorney? * * * Hey, if I'm not under arrest why do I have to even do this?" Officers replied "This right here has nothing to do with your request for an attorney. This is all just a part of the investigative process." Officers also indicated that *6 they had contacted appellant's parole officer and that he was under a parole holder.
{¶ 18} While officers took photographs of appellant's body, he made the following statement: "So, where, er, who am I going to be talking to next?" Officers responded, "A lawyer. Because once you tell us you want to talk to an attorney, we ..." Appellant then said "unless you want to take that back, right?" Officers responded: "It's totally up to you, bud. It's totally up to you." A discussion followed about appellant being under the influence of marijuana at the moment and having smoked crack "a couple of times in the last week." In spite of this, appellant maintained that he was clear headed, although he acknowledged that he hadn't eaten since the day before. Officers told appellant they would let him be more clear-headed before talking to them. Then appellant said: "It's not going to take a genius to know once I'm in jail. I'm going to get locked up. I know it. I messed up." Officers told appellant that he needed to reflect on whether he wanted to talk to them because of his drug usage. Appellant then stated that he had not eaten since the previous day. He said "I already know I'm going back." They discussed his medication, Depakote, for epilepsy, then asked, "So, what's your thoughts about talking to us?" He said, "Listen, there are things I'm not going to be able to hide. * * * I'm getting in trouble for this Tom thing."
{¶ 19} Officers again left appellant alone in the room with the door closed and with the promise to bring food. Officers returned fourteen minutes later and told appellant they would get him food and epilepsy medicine. They talked again about appellant asking for an attorney and when the officers returned, then taking it back. When asked if he wanted to "take it back," appellant said "The attorney ain't going to be able to help me. * * * I don't want one." At that point, thirty-five minutes into the second tape, officers discussed appellant's Miranda rights. After discussing the Miranda rights waiver form and obtaining appellant's signature, appellant confessed to killing Thomas Mead. At that point, the officers placed appellant under arrest.
{¶ 20} Once again, the first issue is whether appellant was in custody for purposes of Miranda . Although officers told appellant he was not under arrest and he came voluntarily to the station, the officers' treatment of appellant after he arrived at the police station arguably placed appellant in custody. Officers placed appellant in a room at the police station, closed the door, took his cell phone and discussed his parole status. Because the question, of whether appellant was actually in custody or whether he was free to leave the station and, hence was not in custody, is not critical in this case. In light of the facts we will assume for purposes of argument that a reasonable person in that setting would not believe that they were free to leave.
{¶ 21} We must next determine whether appellant invoked his right to counsel. "When dealing with a claim that law enforcement continued to interrogate the accused after he invoked his right to counsel, the first question is 'whether appellant actually involved his right to counsel.' " State v. Jacobs , 4th Dist. Highland No. 11CA26, 2013-Ohio-1502, 2013 WL 1614960, ¶ 18, quoting Smith v. Illinois , 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). Invocation of the Miranda right to counsel requires, at a minimum, some statement that can reasonably be construed as an expression of a desire for the assistance of an attorney. Jacobs at ¶ 18, quoting Davis v. United States , 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).
{¶ 22} In the case sub judice, we recognize that appellant did, in fact, explicitly *7 invoke his right to counsel. However, if a defendant invokes his or her right to counsel, " 'we may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.' " Jacobs at ¶ 19, quoting Smith v. Illinois , 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 488, citing Edwards v. Arizona , 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Edwards, the United States Supreme Court held that an accused, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation until counsel had been made available, unless the accused himself initiates further communication, exchanges, or conversations with the police. The Supreme Court of Ohio cautions that "[o]nce an accused invokes his right to counsel, all further custodial interrogation must cease and may not be resumed in the absence of counsel unless the accused thereafter effects a valid waiver of his right to counsel or himself renews communication with the police." State v. Williams , 6 Ohio St.3d 281, 452 N.E.2d 1323 (1983), paragraph four of the syllabus. In the case sub judice, we agree with the trial court's conclusion that appellant initiated further communication with law enforcement when he stated that he wanted to "take back" his previous request for counsel, and again later when he said "I don't want one."
{¶ 23} However, our analysis does not end with having concluded that appellant was under custodial interrogation, invoked his right to counsel, and then himself initiated further conversation with law enforcement. Rather, we must consider whether appellant voluntarily made his statements. After our review of the facts in this case, we conclude that they did. "A suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings. Oregon v. Elstad , 470 U.S. 298, 318, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In such circumstances, a suspect's second "Mirandized" statement will be admitted into evidence if the suspect's waiver is deemed voluntary. The "voluntariness" test requires an examination of the totality of the circumstances surrounding each confession. Oregon v. Bradshaw , 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). Factors to be considered are "* * * the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." State v. Edwards , 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, rev'd on other grounds , 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).
{¶ 24} Appellant, a thirty-one year old man on parole, was properly Mirandized before he confessed to murder. After appellant asked for a lawyer, officers stopped asking questions about the crime and returned to general questions and clarifying his parole status. After appellant later stated that he wished to "take back" his request for counsel, the record shows that officers carefully sought clarification as to whether that was his true intent, and also sought to clarify whether appellant was clear-minded. Here, the record reveals that after appellant signed a waiver of his rights and acknowledged that he understood those rights, appellant confessed. Like the trial court, we find no evidence in the record to suggest that the officers mistreated the appellant or that appellant was subjected to coercive or abusive tactics. Further, Officer Roar testified that, in spite of appellant's admitted drug use, he seemed coherent and intelligent. Also, appellant testified at the suppression hearing *8 that officers had been "more than generous" in their treatment of him at the station.
{¶ 25} After our review of the record, and based upon the totality of the circumstances, we conclude that appellant knowingly and voluntarily waived his Miranda rights, that appellant's statements, both pre-and post Miranda, were voluntary given and properly deemed admissible into evidence. Therefore, the trial court properly denied appellant's motion to suppress evidence.
{¶ 26} Accordingly, based upon the foregoing reasons, we overrule appellant's assignment of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
Hoover, P.J. & McFarland, J.: Concur in Judgment & Opinion